# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-25-00266-CV

---

### In re The Committment of Desiree Hamm

---

### FROM THE 466TH DISTRICT COURT OF COMAL COUNTY
### NO. C2023-2020E, THE HONORABLE STEPHANIE BASCON, JUDGE PRESIDING

---

## O P I N I O N

This appeal is from a civil-commitment proceeding in which the State petitioned to have appellant Desiree Hamm declared a sexually violent predator (SVP) under the Civil Commitment of Sexually Violent Predators Act (SVP Act). *See* Tex. Health & Safety Code §§ 841.001-.209. After a jury found unanimously and beyond a reasonable doubt that Hamm is an SVP, the trial court rendered the final judgment and order of commitment that Hamm challenges. This appeal is the first involving a female civilly committed as an SVP in Texas.

Hamm concedes that the State presented three qualified expert witnesses who rendered relevant opinions based on the data in her case, the facts of her underlying crimes, prison disciplinary conduct records, and her family history. But she contends that the trial court abused its discretion by denying her pretrial motions to exclude the experts' opinions as unreliable because there is no research validating risk factors for sex offenders who are female; and thus, there is insufficient empirical evidence for expert opinion about her recidivism risk.

She also contends that there is no evidence supporting the jury's SVP finding. We will affirm the trial court's final judgment and order of commitment.

## BACKGROUND

The SVP Act defines an SVP as a person who (1) is a repeat sexually violent offender and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence. *Id.* § 841.003(a). A "behavioral abnormality" is "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2). The SVP Act's language makes no distinction between genders, and its provisions apply to any "person" meeting the criteria for civil commitment as an SVP.

Hamm was convicted in 2011 of thirteen sexual offenses after pleading guilty to all of them. Nine of those were for sexually violent offenses: two counts of aggravated kidnapping with intent to violate sexually on February 12, 2010; three counts of sexual assault on February 14, 2010; three counts of sexual assault on February 20, 2010; and one count of sexual assault on March 13, 2010. *See* Tex. Penal Code §§ 20.04(a)(4), 22.011. Hamm was also convicted of two counts of sexual performance by a child. *See id.* § 43.25(b). She received deferred adjudication for two additional counts of sexual performance by a child. *See id.*

Hamm's offenses were committed over a couple of months against two sisters, who were sixteen and fifteen years old when they began interacting extensively with then twenty-two-year-old Hamm through role-playing games online, instant messaging, phone calls, and webcams. Hamm gave the girls gifts, including cell phones and laptops used to

2

communicate with her that could not be easily monitored by their parents. Over time, Hamm convinced the sisters that they were being physically and sexually abused by their father, that they were being poisoned, and that they needed to get out of the house and run away because of the sexual abuse. Hamm persuaded them to write letters to their teachers, family members, and friends with the accusations against their father. Hamm convinced the sisters that they were in love with each other, eventually getting them to have sex with each other while Hamm directed their sexual conduct and watched on the webcam. Hamm later convinced the sisters that they were pregnant and further convinced one sister that she had undergone an abortion.

With Hamm's assistance, the girls ran away from home. She instructed them to bring their passports, school records, and immunization records, and arranged for someone to drive from San Diego to Comal County to get them and drive back with them in the trunk. Before the girls arrived in California, their mother realized they were missing and called Hamm, who lied about the girls' location. Once the girls were in California, Hamm sexually assaulted them multiple times. Hamm changed their appearance by cutting and coloring their hair, and she placed them with a neighbor who lived in an apartment upstairs. When police arrived at Hamm's apartment to see if the girls were with her, she denied ever meeting them in person.

Hamm continued having sexual contact with the girls when she knew others were looking for them. She compelled them to do as she told them. When they did not, Hamm would shoot them with an airsoft gun or use finger-pricking devices on them. Another time, after watching a pornographic movie with sadomasochistic sexual scenes of whipping and caning,

3

Hamm had one of the sisters hit the other with a cane, leaving marks. And Hamm branded the girls' bodies with a homemade brand of a wolf paw print.[1]

Hamm later moved the girls from San Diego to Fresno and misdirected their family members' efforts to find them. Hamm lied to the girls' family members who flew to California soon after the girls went missing and to the family's attorney who met with her. She told the family members to buy disposable phones to receive the girls' calls and then had the girls make calls to their family's untraceable phones and lie to them. Other times, Hamm falsely told the family that the girls were in Rochester, New York or elsewhere. She told one of the girls' aunts that while watching the webcam, she witnessed the girls' father raping them. Once reunited with their family, the girls denied that their father had sexually abused them.

Hamm engaged in similar conduct before. Around 2007, Hamm met a sixteen-year-old girl from Georgia online, sent her a cell phone and gifts, told her she was being sexually abused by her stepfather in her sleep, coerced her to run away when she was seventeen to stay in California with Hamm, arranged for the trip, began having sex with the girl after she arrived, and called the girl her wife. After police were notified, they investigated and questioned Hamm for the offense of oral copulation with an underage person.[2] Before Hamm's relationship with that girl ended, Hamm began talking to one of the sisters in the Comal County case.

After accepting Hamm's pleas of guilty to all the offenses against the sisters, the trial court assessed Hamm's punishment at twenty years' imprisonment on each of the nine

---

[1] Hamm has a tattoo of a wolf paw print on her arm.

[2] Among the records provided to the experts were the girl's statement to police and her recorded police interview.

4

sexually violent offenses and ordered the sentences to run concurrently.[3]  While serving sentences for her crimes against the sisters, Hamm had sex with other inmates despite knowing that such conduct violated prison rules.  She received disciplinary action for having sex in a prison bathroom stall.  And she resumed her online role-playing games, now with inmates and pen pals.

Before Hamm's release from prison, the State petitioned the trial court for her civil commitment as an SVP because she "is a repeat sexually violent offender who suffers from a behavioral abnormality that makes her likely to engage in a predatory act of sexual violence." *See* Tex. Health & Safety Code § 841.003(a).  The State alleged that Hamm was pending entry into the prison's sex-offender-treatment program, which could result in her release on parole before her discharge date.  The trial court found Hamm indigent and appointed counsel for her.

Hamm filed pretrial motions to exclude opinions from the State's expert witnesses—psychiatrist Dr. Michael Arambula, and psychologists Dr. Jason Dunham and Dr. Christine Reed—as unreliable.[4]  The trial court denied the motions.  Hamm presented no defense witnesses at her civil-commitment trial.  Her motion for directed verdict was denied.  The jury unanimously found that Hamm is an SVP.  The trial court rendered a final judgment and order of commitment on that verdict.  *See id.* §§ 841.062(b) (addressing jury determination of person's status as SVP), .081 (addressing SVP civil-commitment order).  Hamm appeals.

---

[3]  The trial court also assessed Hamm's punishment at twenty years' imprisonment on two counts of sexual performance by a child.  Upon her release from prison, Hamm would begin two, ten-year-probated sentences under her order of deferred adjudication for the remaining two counts of sexual performance by a child.

[4]  The testimony from the experts showed that the State Counsel for Offenders, which represents Hamm, has requested expert opinions from each of them in other matters and sometimes retained them as experts.

## DISCUSSION

**Reliability of experts' testimony**

Hamm's first issue contends that the experts' opinions are unreliable and should have been excluded before trial because there is no research validating the risk factors for sex offenders who are female and because there is insufficient empirical evidence for the experts' opinions about her recidivism risk. We review a trial court's decision on the admissibility of such evidence under an abuse-of-discretion standard. *In re Commitment of Martin*, No. 03-23-00128-CV, 2023 WL 5597357, at *2 (Tex. App.—Austin Aug. 30, 2023, no pet.) (mem. op.). A trial court abuses its discretion if it acts arbitrarily, unreasonably, without regard for guiding rules or principles, or without supporting evidence. *Id.* Excluding relevant and reliable evidence is an abuse of discretion. *In re Bohannan*, 388 S.W.3d 296, 307 (Tex. 2012).

A witness who is qualified "by knowledge, skill, experience, training, or education" to "assist the trier of fact to understand the evidence or to determine a fact in issue" may testify as an expert. *In re Commitment of Martin*, 2023 WL 5597357, at *2 (quoting Tex. R. Evid. 702). Expert opinions must have a reasoned basis. *Burrow v. Arce*, 997 S.W.2d 229, 236 (Tex. 1999). Thus, an expert must connect his conclusions to the facts. *Windrum v. Kareh*, 581 S.W.3d 761, 768 (Tex. 2019). An expert's testimony is conclusory when "no basis for the opinion is offered" or the "basis offered provides no support." *In re Commitment of Martin*, 2023 WL 5597357, at *2 (quoting *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009)).

Evidence in SVP civil-commitment proceedings concerns the application of a "soft" science, calling for the exercise of considerable intuitive judgment by experts with specialized training. *In re Commitment of Delarosa*, No. 03-21-00541-CV, 2022 WL 3403347,

6

at *7 (Tex. App.—Austin Aug. 17, 2022, no pet.) (mem. op.). Reliability of such soft-science evidence in the SVP context may be established by showing that

> (1) the field of expertise involved is a legitimate one,
>
> (2) the subject matter of the expert's testimony is within the scope of that field, and
>
> (3) the expert's testimony properly relies on or utilizes the principles involved in that field.

*In re Commitment of R.E.A.*, No. 14-22-00742-CV, 2024 WL 807238, at *8 (Tex. App.—Houston [14th Dist.] Feb. 27, 2024, pet. denied) (mem. op.); *In re Commitment of Pipkin*, No. 07-22-00182-CV, 2023 WL 4345716, at *3 (Tex. App.—Amarillo June 28, 2023, pet. denied) (mem. op.); *In re Commitment of Johnson*, 613 S.W.3d 613, 620-21 (Tex. App.—San Antonio 2020, pet. denied); *In re Commitment of Mitchell*, No. 09-12-00607-CV, 2013 WL 5658425, at *1 (Tex. App.—Beaumont Oct. 17, 2013, pet. denied) (mem. op.).

These three reliability factors, first listed by the Court of Criminal Appeals in *State v. Nenno*, recognize that "soft science or non-scientific expert testimony is held to a less rigorous standard than hard science expert testimony." *Allison v. State*, 666 S.W.3d 750, 759 (Tex. Crim. App. 2023) (citing *Nenno*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled in part on other grounds by State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999)). The reliability standard for soft science expert testimony set forth in *Nenno* is distinct from the standard for hard science expert testimony set forth in *Kelly v. State* because expert testimony involving soft sciences and fields is "based primarily upon experience and training as opposed to scientific methods." *Id.* (distinguishing *Kelly*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992) from *Nenno*, 970 S.W.2d at 561). At the pretrial hearing on Hamm's motion to exclude, the

State argued that the proper reliability standard for these experts' opinions is the three-factor test derived from *Nenno*, while Hamm argued for the reliability standard in *Kelly*.

During the hearing, the experts testified about their experience, training, and education, and their curricula vitae were admitted into evidence. Their opinions drew from, among other things, the data in the case, the facts of Hamm's crimes, her prison disciplinary conduct records, and her family history. All three experts examined Hamm, worked with or evaluated female sex offenders for risk assessments before this case, and explained their conclusions that Hamm has a behavioral abnormality that makes her likely to engage in predatory acts of sexual violence. Before addressing Hamm's reliability challenges to the experts' opinions, we summarize their hearing testimony.

### 1. Dr. Arambula

Dr. Michael Arambula testified that he is a medical doctor, board certified in general psychiatry and forensic psychiatry, who has conducted behavioral-abnormality evaluations using the terms and definitions in the SVP Act for over twenty years. He has conducted over 300 such behavioral-abnormality evaluations, about twelve to fifteen of those on female sex offenders who committed sex crimes against children. He conducted one prior evaluation of a female sex offender for SVP civil commitment, concluding that the criteria for having a behavioral abnormality were unmet.

In this case, using forensic-psychiatry principles, his education, training, and experience, Dr. Arambula found that Hamm has a behavioral abnormality within the meaning of the SVP Act that makes her likely to engage in a predatory act of sexual violence. He consulted the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition—an American Psychiatric Association textbook containing symptomatic criteria for common mental conditions

8

that medical and mental-health professionals use in diagnostic decision-making—in determining that Hamm has significant personality pathology. He diagnosed her as having "unspecified personality disorder with borderline antisocial and histrionic features," and sexual deviance in the form of hebephilia.[5]

Dr. Arambula testified about the basis for his opinion that Hamm has a behavioral abnormality. He began by explaining the methodology for a sex-offender risk assessment, which is gender neutral and involves (1) performing a general psychiatric exam in which he looks at the individual's history with family and peers, school and occupational functioning, mental illness or substance abuse, personality pathology, and any medication issues that might contribute to the sexual offenses; (2) considering forensic matters, including what the individual reports to him about what led to the sexual offense, what occurred during and after the sexual offense, and why it occurred again; and (3) considering the person's adjustment to prison, including any activities undertaken for self-improvement, any treatment they have had, and how successful treatment has been for the person to understand the mechanisms or reasons why they offended so they can manage and have better control once they are out in the community. Additionally, Dr. Arambula considered records spanning Hamm's entire life, which contained much information that was inconsistent with what Hamm reported to him. Dr. Arambula testified that his methodology and the type of records he reviewed are in accordance with his training and with accepted standards in forensic psychiatry, and it is the same methodology and record review used by others with forensic-fellowship training when conducting behavioral-abnormality evaluations. He noted that no single test can be scored to determine whether a person has a behavioral abnormality.

---

[5] Dr. Arambula later explained that the medical diagnosis of hebephilia is distinct from pedophilia because hebephilia involves children beyond age thirteen.

9

In making his determination that Hamm has a behavioral abnormality, Dr. Arambula considered research and literature as it relates and applies to her history. He determined the extent and seriousness of the sexual deviance that prompted Hamm's sexual misconduct by seeking patterns of repeated behavior. He looked at the number of victims, the extent of grooming that occurred, plus indications of sociopathy, mental illness, relationship instability, and personality pathology. He testified that such considerations have been discussed in literature on female sex offenders.

Dr. Arambula was already familiar with research on female sex offenders and had evaluated female sex offenders before he interviewed and evaluated Hamm. Among other sources, he was familiar with research or data from chapters on female sex offenders in Dr. Barbara Schwartz's textbooks; articles on female sex offenders by Canadian researcher Dr. Michael Seto; a publication of a study by the Sex Offender Management Assessment and Planning Initiative (SOMAPI) containing information on female sex offenders; and an article by a California governmental agency titled State Authorized Risk Assessment Tools for Sex Offenders (SARATSO). He had recently refamiliarized himself with many of these updated publications when conducting another evaluation before Hamm's.

Dr. Arambula is unaware of any research or articles stating that female sexual offenders do not reoffend. There is research indicating that female sex offenders overall recidivate at a lower rate than male sex offenders, but he denied that the rate is zero. Further, he noted that the numbers relative to sex-offender recidivism are artificially underestimated. One reason recidivism numbers skew lower is that the average risk is based on a large pool of female sex offenders, and most of the women studied are first-time sex offenders who were caught after

a one-time episode and had only one victim.[6]   Dr. Arambula explained that the two largest components in the pool of female sex offenders are the teacher-who-has-sex-with-her-student type and the co-defendant type, who grooms and brings in young girls for a male perpetrator. Dr. Arambula distinguished those kinds of sex offenses from Hamm's.  He pointed out that sex-offender-recidivism research uniformly shows that repeat sex offenders, including women, with more than one victim have more serious underlying sexual deviance and an increased recidivism risk.  He observed that here, Hamm had more than one victim.

Dr. Arambula is aware of a publication denying the existence of any standard of care in evaluating female sex offenders, but he disagrees with its authors.  He acknowledged that research findings from male-sex-offender research cannot be translated literally to female sex offenders because they differ in how they sexually exploit their victims and their motivational factors.  Thus, he explained that if a man carries a 15% average risk factor for recidivism, it cannot be assumed that is the same for a woman.  And he said it would be misleading to argue that the percentage of risk found in the studies concluding women overall recidivate less often necessarily represents Hamm's specific risk to reoffend.

Dr. Arambula testified that Hamm has significant personality pathology, and personality pathology does not discriminate between men and women.  Dr. Arambula testified that "personality pathology, particularly when it involves the manipulation of other people for the perpetrator's own benefit, is an important parameter in looking at risk."  Unlike a caregiver who might opportunistically exploit a child entrusted to them, Hamm is "a crossover type of sex offender" who groomed her victims for an extended time online before committing

---

[6]  Dr. Arambula faulted the samples in other sex-offender-studies for their inclusion of prostitutes, "a totally different type of individual compared to somebody who preys on minors."

11

sexual-contact offenses. Dr. Arambula noted that the SOMAPI publication summarized studies showing that sex offenders who first groom their victims online are particularly antisocial and carry a high recidivism risk.

Dr. Arambula testified without objection that the field of forensic psychiatry is a legitimate one, that the subject matter of his potential testimony to the jury was within the scope of forensic psychiatry, and that he properly relied upon or utilized the principles involved in that field when evaluating Hamm and arriving at his opinion.

## 2. Dr. Jason Dunham

Jason Dunham testified that he is a doctoral-level, fellowship-trained forensic psychologist. Over the last twenty years, he has performed 346 behavioral-abnormality evaluations, including six or seven on female sex offenders. When evaluating those other female sex offenders for risk, he followed the same procedure and methodology that he did in this case. Here, using forensic-psychology principles, his education, training, and experience, Dr. Dunham found that Hamm has a behavioral abnormality and falls within the category of those that would reoffend.

Dr. Dunham testified about the basis for his opinion that Hamm has a behavioral abnormality. He explained that the primary components of his methodology for a sex-offender risk assessment involve reviewing records and conducting a research-driven clinical interview. He learned this methodology during his internship and fellowship, and it is a methodology that is in accordance with accepted standards in the field of psychology and used by others who conduct these evaluations. Dr. Dunham followed the same methodology when he evaluated Hamm.

Dr. Dunham was familiar with research and literature on female sex offenders before his evaluation of Hamm, and he considered that research and literature in reaching his

12

opinion, including a textbook titled Evaluating Sex Offenders by Dennis Doren that compares different evaluation methodologies. When evaluating female sex offenders, Dr. Dunham does not score an actuarial instrument because of the lack of normative data for female offenders behind those instruments. He acknowledged that there is not a lot of research on recidivistic, sexually violent behavior among female sex offenders, and one article has found a lack of consistency among the risk factors for females. He considered the cautions in the research when forming his opinion about Hamm. However, none of the research indicates that female sex offenders do not reoffend.

Dr. Dunham reviewed information in records spanning the duration of Hamm's life when conducting her risk assessment. He explained that the best way of estimating future risk is by looking at past behavior and patterns of behavior, which involves looking at all elements of the person's life. He consulted the Diagnostic and Statistical Manual in diagnosing Hamm and determining that she met criteria for various personality orders. He noted that some research estimates that between 1% and 3% of female sex offenders reoffend, and those reoffenders are a mixed group. Only in severe cases, where extreme risk factors exist, can it be said that the person would represent that small category of reoffenders. Having considered Hamm and her case on an individual basis, Dr. Dunham opined that Hamm is within that category of female sex offenders who would reoffend.

Dr. Dunham testified without objection that his intended testimony about Hamm was within the scope of forensic psychology, and that he properly relied upon and utilized forensic-psychology principles in his methodology, in evaluating Hamm, and in reaching his opinion.

### 3. Dr. Christine Reed

Dr. Christine Reed testified that she is a doctoral-level, fellowship-trained clinical and forensic psychologist. She has conducted about 115 behavioral-abnormality evaluations since 2011 using the information and definitions in the SVP Act, and she has performed sex-offender-risk assessments of males and females. Before evaluating Hamm, Dr. Reed evaluated six other female sex offenders for behavioral abnormality. None of those women were exempt from a behavioral-abnormality finding based on their gender.

In the present case, using forensic-psychology principles, her education, training, and experience, Dr. Reed found that Hamm has a behavioral abnormality. Dr. Reed consulted the Diagnostic and Statistical Manual in diagnosing Hamm as having "unspecified personality disorder with borderline antisocial and histrionic features." Dr. Reed also found Hamm exhibited certain risk factors including sexual deviance, antisocial personality, psychological coercion, minimization, and denial.

Dr. Reed testified about the basis for her opinion that Hamm has a behavioral abnormality. She summarized her methodology, which included reviewing several of Hamm's records, conducting a clinical examination, administering the Hare Psychopathy Checklist and the Level of Service Risk Needs Responsivity measures, and reviewing additional records provided after the evaluation. Dr. Reed testified that the records spanned Hamm's adult life and that having such historical information assists in identifying patterns of behavior, revealing risk factors in the nature of the offenses or personal characteristics, and making diagnoses of mental illness or personality pathology. She stated that she does not look specifically for a personality disorder, but for any signs of mental illness or pathology and relevant diagnostic possibilities. Dr. Reed testified that the methodology she used and the interview she conducted with Hamm

14

were in accordance with her training and with accepted standards in the forensic-psychology field. She noted that there is no single test that can be scored or any one measure that can be used to determine whether a person has a behavioral abnormality.

Dr. Reed has reviewed research and literature on sexual reoffending and female sex offending, and she considered those sources in reaching her opinion. Among the articles and book chapters she reviewed were Insights on Female Sexual Offenders, Evaluating Female Sex Offenders Without Prejudice, Female Sex Offender Recidivism-Empirical Analysis of Registered Sex Offenders in California, and The Assessment of Female Sexual Offenders. She acknowledged that there is more research on male sex offenders than on female sex offenders, and that some articles suggest a lower risk for female reoffending. She noted that underreporting is one reason the recidivism rates are lower, but that none of the research indicates female sex offenders do not or are unlikely to reoffend.

Dr. Reed denied making a subjective judgment, and she denied taking risk factors related to males and automatically applying them to Hamm. Instead, Dr. Reed took the information from the research on female sex offenders and applied it to the case by looking at the risk factors identified and matters discussed and how those might or might not relate to Hamm. Dr. Reed explained that while the research informs her that women overall recidivate less often, it does not necessarily provide a specific rate of Hamm's risk of reoffending.

Hamm's counsel, referencing a scientific method inapplicable to expert testimony in soft sciences, asked Dr. Reed to identify research showing that a risk factor for women had been validated in a "laboratory setting." Dr. Reed replied that none of this research is done in a laboratory. She explained that only field studies are used because "you can't put people into a lab and force them to sexually offend against people." Dr. Reed testified without objection that

15

she properly relied upon and utilized forensic-psychology principles in her methodology, in evaluating Hamm, and in reaching her opinion.

Hamm's pretrial motions challenging the reliability of all three of these experts' opinions drew heavily from a Missouri decision, *In re Coffel*, 117 S.W.3d 116 (Mo. Ct. App. 2003). In that case, an intermediate appellate court held that insufficient evidence supported Angela Coffel's civil commitment as an SVP and noted that one expert had never performed a risk assessment under Missouri's SVP statute,[7] had no training in that area, and had never examined Coffel; while another expert had never diagnosed or counseled any female sex offenders and could not say whether characteristics in the studies she relied on were risk factors for reoffending. *Id.* at 122, 123. *Coffel* is distinguishable because unlike the experts in that case, Dr. Arambula, Dr. Dunham, and Dr. Reed each conducted behavioral-abnormality evaluations on female sex offenders under the Texas SVP Act, completed training in that area, and examined Hamm in reaching their opinions. Additionally, *Coffel* is immaterial to the reliability challenge Hamm raises here because the Missouri Supreme Court underscored that the court of appeals'

---

[7] Hamm's counsel conceded during the pretrial hearing that the Missouri SVP statute is distinct from the Texas SVP statute, and while Missouri made certain changes to its law, Texas "so far has not followed suit." The Missouri statute requires proof that the person sought to be civilly committed as an SVP is "more likely than not" to engage in predatory acts of sexual violence, but the Texas statute requires a finding that the person is "likely" to engage in a predatory act of sexual violence. *Compare* Mo. Rev. Stat. § 632.480(5), *with* Tex. Health & Safety Code § 841.003(a)(2). Texas courts have rejected arguments equating "likely" in the Texas SVP statute with "more likely than not." *See, e.g.*, *In re Commitment of Johnson*, No. 05-17-01171-CV, 2019 WL 364475, at *3 (Tex. App.—Dallas Jan. 30, 2019, no pet.) (mem. op.) (concluding that statutory use of "likely" should not be interpreted as "more likely than not"); *In re Commitment of Riojas*, No. 04-17-00082-CV, 2017 WL 4938818, at *4 (Tex. App.—San Antonio Nov. 1, 2017, no pet.) (mem. op.) (rejecting argument that meaning of "likely" is equivalent to "more likely than not"); *In re Commitment of Rushing*, No. 09-11-00268-CV, 2012 WL 4466421, at *2 (Tex. App.—Beaumont Sept. 27, 2012, no pet.) (mem. op.) ("Noticeably absent from the statute describing a sexually violent predator is any requirement that the person's behavioral abnormality make the person *more likely than not* to engage in a predatory act of sexual violence.").

16

ultimate holding "did not speak to the sufficiency of the foundation of the expert testimony." *Elliott v. State*, 215 S.W.3d 88, 93 (Mo. 2007). The high court rejected the argument that under *Coffel* expert testimony could be deemed inadmissible because it was not based on reliable science or research and characterized such argument as an "exaggerated" reading of *Coffel*. *Id.*

Hamm's citation to *In re Commitment of Winkle*, 434 S.W.3d 300, 308 (Tex. App.—Beaumont 2014, pet. denied), in support of her reliability challenge is equally unpersuasive. In *Winkle*, a defense expert skipped examining the person sought to be civilly committed as an SVP and opined, based only on the expert's own unpublished research, that actuarial studies are better than clinical judgments at predicting whether a sex offender might reoffend. *Id.* at 306, 308. The expert failed to provide evidence of his methodology or a copy of any article he authored on sex-offender-recidivism risks and did not show that his opinion about the claimed superiority of actuarial studies in predicting sex-offender recidivism was one generally accepted in his field of psychology. *Id.* at 309. Thus, the Beaumont Court of Appeals affirmed the exclusion of the expert's unreliable testimony as the mere *ipse dixit* of that witness. *Id.* at 310. By contrast here, the trial court was provided with evidence of all three experts' methodology, that such methodology is in accordance with accepted standards in their respective fields of psychiatry and psychology, that they considered research and literature on female sex offending, and that they each examined Hamm in reaching their opinions.

Within her challenge to the reliability of the experts' opinions, Hamm contends that the experts provided insufficient empirical evidence supporting their opinions about her recidivism risk. No aspect of the soft-sciences standard or the SVP Act requires such evidence. Rather, the record establishes that all three experts were experienced and licensed in their respective fields of psychiatry and psychology, which are legitimate fields of study, and the

subject matter of their testimony was within the scope of their respective fields. Further, their testimony properly relied on or utilized the principles involved in their fields of psychiatry and psychology in evaluating Hamm and reaching their opinions. They each examined Hamm, reviewed records typically relied upon by experts in their fields, including records spanning Hamm's lifetime, for the most comprehensive information. They conducted their assessments in accordance with the accepted standards within their fields, and each expert's methodology was consistent with that of their colleagues. They testified about patterns of behavior that were significant in their assessment, and about the research and literature they reviewed and were familiar with concerning female sex offenders. They consulted the Diagnostic and Statistical Manual, an authoritative medical text, in diagnosing Hamm with personality disorders. In sum, the record shows that Dr. Arambula's, Dr. Dunham's, and Dr. Reed's expert opinions met the soft-sciences standard set by Texas courts for reliability. *See Allison*, 666 S.W.3d at 759; *In re Commitment of R.E.A.*, 2024 WL 807238, at *8; *In re Commitment of Pipkin*, 2023 WL 4345716, at *3; *In re Commitment of Johnson*, 613 S.W.3d at 620-21; *In re Commitment of Mitchell*, 2013 WL 5658425, at *1.

The SVP Act "merely establishes *what* the State must prove, not *how* the State must go about proving it." *In re Commitment of Dever*, 521 S.W.3d 84, 87 (Tex. App.—Fort Worth 2017, no pet.). An expert's experience alone may provide some of the requisite basis for their opinion and proffering medical or academic literature is not always necessary. *In re Commitment of Owensby*, No. 07-24-00216-CV, 2024 WL 4549271, at *1 (Tex. App.—Amarillo Oct. 22, 2024, pet. denied) (mem. op.) (citing *Windrum*, 581 S.W.3d at 769). The trial court here heard the experts' testimony that studies about recidivism rates in female sexual offenders are ongoing, few, and flawed. As the gatekeeper, the trial court determined how to assess the

18

reliability of the experts' testimony. *In re Commitment of Martinez*, No. 09-05-493-CV, 2006 WL 2439752, at \*3 (Tex. App.—Beaumont Aug. 24, 2006, no pet.) (mem. op.).

In an analogous case, an Illinois court of appeals concluded that a trial court did not abuse its discretion by considering a sex-offender evaluation of a female when the court was made aware of the limitations as to the available research regarding female juvenile sex offenders and weighted the evidence accordingly. *See In re Vianca J.*, 2019 WL 5295072, at \*15 (Il. App. Ct. 2019). Making an argument similar to Hamm's, Vianca J.—a female charged with aggravated sexual criminal assault, criminal sexual assault, and criminal sexual abuse and sentenced to the Illinois Department of Juvenile Justice for an indeterminate term—contended that a sex-offender evaluation of her was faulty because there was no "empirical basis applicable to female juvenile sex offenders to draw the conclusions that were in the sex offender evaluation." *Id.* at \*1, 14. Rejecting that argument, the appellate court noted that the licensed clinical social worker who had completed the sex-offender evaluation reviewed several types of documentary evidence (including court documents, police reports, and a social-history investigation), met with Vianca J., concluded that she was at high risk to reoffend, and acknowledged the lack of research on the level of sexual or general recidivism among female adolescent sexual offenders. *Id.* at \*15. The trial court was thus aware of the limitations as to the available research regarding female juvenile sex offenders and presumptively accorded the sex-offender evaluation of Vianca J. its proper weight. *Id.* The trial court here could have done the same in assessing the reliability of the experts' opinions about Hamm.

Moreover, if we accepted the argument that currently no expert may reliably testify in an SVP case that a female has a condition making her likely to commit another sexual assault or sexually violent offense, then females would be categorically exempt from civil

commitment under the SVP Act. Such a gender exemption would be contrary to the plain wording of the SVP Act, which refers only to a "person," and would produce an absurd result that the Legislature did not intend. *See* Tex. Health & Safety Code § 841.003(a); *In re Commitment of Gipson*, 580 S.W.3d 476, 482 (Tex. App.—Austin 2019, no pet.) (recognizing that words in SVP statute are construed using their plain and common meaning unless contrary intention is apparent from context or unless such construction leads to absurd results). On this record, we conclude that the trial court did not abuse its discretion by overruling Hamm's reliability objections to the State's three experts' opinions. Hamm's first issue is overruled.

**Legal-sufficiency of evidence**

Hamm's second issue challenges the legal sufficiency of the evidence supporting the jury's SVP finding. The State must prove beyond a reasonable doubt that the person it seeks to civilly commit is an SVP as defined in the SVP Act. Tex. Health & Safety Code § 841.062. When reviewing a legal-sufficiency challenge to the evidence in an SVP case, we assess all the evidence in the light most favorable to the verdict to determine whether a rational jury could find, beyond a reasonable doubt, each of the elements that the State must prove to support a judgment of civil commitment. *In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020); *In re Commitment of Hill*, No. 03-25-00138-CV, 2026 WL 110729, at *1 (Tex. App.— Austin Jan. 15, 2026, no pet. h.) (mem. op.).

As noted, an SVP is defined as a person who (1) is a repeat sexually violent offender and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence. Tex. Health & Safety Code § 841.003(a). The first element is uncontested. The State proved that Hamm is a repeat sexually violent offender, as established by

her nine convictions for sexually violent offenses, consisting of sexual assaults and aggravated kidnappings with intent to violate sexually. Hamm testified on her own behalf at trial but presented no other defense witness.

Hamm challenges only the second element in the SVP statutory definition, contending that the evidence is legally insufficient to support the jury's finding that she suffers from a behavioral abnormality that makes her likely to engage in a predatory act of sexual violence. *See id.* § 841.003(a)(2). She contends specifically that Dr. Arambula, Dr. Dunham, Dr. Reed, and Jennifer Deyne, the deputy director of sex-offender programs for the Texas Department of Criminal Justice, provided testimony that was conclusory.

We have already determined that the expert witnesses' opinions met the soft-sciences standard set by Texas courts for reliability and that the trial court did not abuse its discretion by denying Hamm's motions to exclude them. During trial, the experts testified that Hamm has a behavioral abnormality within the meaning of the SVP Act that makes her likely to engage in predatory acts of sexual violence, and they linked their conclusions to the facts in greater detail.

Dr. Arambula told the jury that he used the Diagnostic and Statistical Manual in diagnosing Hamm with an unspecified paraphilic disorder—which is a chronic condition "when there are multiple victims and it's persisted over time"—as well as persistent depressive disorder, and unspecified personality disorder with histrionic, antisocial and borderline features. He determined that Hamm is not a typical sex offender. He found the predatory nature of her behavior, her extensive grooming of the sisters, her online solicitation, and her eventually deleting—"the modern term nowadays is ghosting"—the sisters' online history especially concerning and dangerous because "these victims are lost unless something happens." Equally

21

concerning to him was that Hamm's role playing, which she said led her to being with the sisters on her webcam and eventually arranging for them to join her in California, has continued and is a driving part of her sexual deviance. He noted that Hamm used violence in her crimes against the girls, including beatings, biting during sexual activity, use of an air gun, finger pricks, and branding of the girls' bodies that resulted in complications from their burns. He explained to the jury that physical violence is a dynamic risk factor that adds to the overall seriousness of the psychological damage from being sexually exploited. And Hamm's family seemed unaware of the severity of Hamm's offenses against the girls, indicating that the quality of the family's support is enabling her. Dr. Arambula testified that when he met with Hamm, she identified herself as a male named Tristan. He recalled that during her deposition, Hamm claimed she was on the prison's gender-dysphoria caseload so that she could skip her periods.[8] He found that Hamm's predatory history resembles that of a male sex offender. He testified that research shows when a female has more features of antisocial personality pathology, including multiple victims, and is predatory, those risk factors for recidivism resemble the risk factors for males, taking that female out of the traditional type of female offender, for example, the one-time offender who is a teacher or day-care worker. Such circumstances involve a different type of sex offender that resembles a male, and while the recidivism risk does not translate literally to male risk characteristics, it approaches that level. The specific antisocial-personality-disorder features he observed were Hamm's lack of responsibility, disregard for her victims, disregard for rules and expectations, and blaming the girls as the reason she did all these things. Similarly, Hamm's psychopathic traits were her callousness, her exploitation and disregard for the safety of others,

_____

[8] Dr. Arambula testified that gender dysphoria involves a person being uncomfortable with some of their gender characteristics.

and her varying responses when it came to accepting responsibility for her offenses. Dr. Arambula testified that Hamm is still at risk of reoffending since she does not understand the condition that drove her behavior. And although some research regarding female sex offenders indicates that their overall risk of recidivism is lower than for male sex offenders, Dr. Arambula opined that Hamm's risk is higher compared to the average risk for females because of the elements in her history, particularly the predatory component, her number of victims, her repeated acts, her use of physical violence, and her significant antisocial personality pathology.

The jury also heard from Dr. Dunham, who told them that he used the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition in diagnosing Hamm with narcissistic personality disorder and histrionic personality disorder. He noted that sexual deviance is part of Hamm's personality disorders, which are lifelong and chronic in nature. He said that this case was an outlier because Hamm is like a "cult leader," a manipulative person who preys on vulnerable teenage girls, and her personality disorder is what drives her condition and makes her likely to reoffend. Hamm's behavioral abnormality comes from her ability, excitement, and enjoyment of conning people and playing games, and the gratification she gets from this conduct extends to sexual things. Hamm used her gender and sexuality to manipulate situations or people, sometimes referring to herself as a man named Tristan, sometimes referring to herself as female, and sometimes wanting to be transgender and having testosterone hormone therapy. She has a fixation with wanting children and trying to get others to become pregnant for her, going so far as to post Craigslist ads for people to have sex with girls that were in her household. Hamm blamed the role-playing game for the sexual contact she orchestrated between the sisters; she claimed that running away was the sisters' idea; and she told Dr. Dunham that none of this was her fault. Dr. Dunham testified that Hamm's narcissistic personality disorder presents itself

23

through her interpersonally exploitive conduct, her taking advantage of others for her own ends, her lack of empathy, and her display of arrogant attitudes or behaviors. He testified that Hamm's histrionic personality disorder presents itself through her excessive need for attention, her inappropriately sexually seductive or provocative behavior, her drawing attention to herself through her physical appearance, and her consideration of relationships to be more intimate than they are. He determined that Hamm's personality disorder affected her emotional or volitional capacity to the extent that she has reoffended and that she is a menace to the health and safety of another person. Dr. Dunham expressed particular concern about parallels between Hamm's activity and behaviors with the Georgia girl that resembled Hamm's later offenses against the Texas sisters.

The jury heard Dr. Reed testify that she used the Diagnostic and Statistical Manual in diagnosing Hamm as having an unspecified personality disorder with histrionic borderline and antisocial features. The main reasons she found Hamm had a behavior abnormality within the meaning of the SVP Act were Hamm's sexual deviance in combination with her significant personality pathology. Dr. Reed explained that by its nature, a personality disorder is a long-standing pervasive pattern of how a person behaves, sees themselves, and interacts with others, so it is a chronic condition. Dr. Reed noted that Hamm had a "pattern of preying on or seeking out relationships or sexual relationships, in particular with underage females," and had a personality pathology that involved "conning, manipulation, pathological lying, using and exploiting others." The sexual-deviance determination Dr. Reed made was based on the totality of the circumstances: the predatory manner in which Hamm was finding these teenage females online, getting them to leave home, having someone pick them up to take them to another state, hiding them there, committing sexual acts immediately upon their arrival,

24

and the indication that she was involved in some sadomasochistic activities. Dr. Reed noted that Hamm used physical coercion and physical force as punishment if certain things were not done, including engaging in sexual acts. Dr. Reed was concerned about the pattern of behavior and the similarity shown in Hamm's prior interaction with the Georgia girl and Hamm's current convictions. Dr. Reed pointed out that when the offenses involving the sisters occurred, Hamm had already had formal contact with law enforcement and been told that her conduct was unacceptable. Yet she committed these subsequent offenses against victims who were even younger and presented a greater age gap between them and Hamm. Dr. Reed noted that there is some overlap between male and female sex offenders in the risk factors for recidivism. Sexual deviance is a major risk factor for sexual reoffending that applies to both males and females. Dr. Reed testified about the Level of Service Risk Needs Responsivity (LSR&R) measure she used to identify Hamm's risk factors, noting that some research suggests criminal recidivism is related to sexual recidivism in females. She stated that, in the absence of specific measures for sexual recidivism in females, the LSR&R measure provides some information about general criminal offending or risk for recidivism and has been noted in literature as helpful in providing an additional piece of data. This measure indicated that Hamm had high-risk needs, which would make her more likely to reoffend or have problems with supervision in the community. Dr. Reed also administered the Hare Psychopathy Checklist (PCL-R), which may be administered to females but not for assessing reoffending risk. Dr. Reed used the PCL-R to score certain traits of Hamm's personality pathology, including manipulation, conning, callousness, and lack of empathy. Hamm's score on this measure indicated that she had a high level of psychopathic traits. Dr. Reed testified that Hamm's personality disorders have negatively impacted her emotional and volitional capacity, noting that Hamm failed to acknowledge any wrongdoing and

25

blamed other factors or people for what happened. Because Hamm has never completed any sex-offender-treatment program, and because of Hamm's lack of self-awareness, Dr. Reed opined that Hamm is a menace to the health and safety of others.

The evidence from these three expert witnesses, viewed in the light most favorable to the jury's verdict, is legally sufficient to support the jury's SVP finding, even without delving into Deyne's testimony about Hamm's "alarming" behavior compared to that of sex offenders in other cases. As we have stated, the legal-sufficiency test is not so stringent as to require citations to books, articles, journals, or other experts. *In re Commitment of Delarosa*, 2022 WL 3403347, at *7; *see In re Commitment of Owensby*, 2024 WL 4549271, at *1 (noting that expert's experience alone may provide some basis for opinion and that proffering medical or academic literature is not necessary in every case). Instead, what is needed is the basis for the testifying expert's opinions, which may include the review of records, an interview or examination of the person being evaluated, the expert's own background and experiences, and support for how the bases connect to the opinions. *In re Commitment of Delarosa*, 2022 WL 3403347, at *7.

Further, Hamm told the jury that she is a sexual predator:

Q. Do you believe that you are a sexual predator?
A. Yes.

When asked whether she believed she would ever again sexually assault anyone, Hamm testified in her deposition, "No, but I can't predict the future." At trial, she told the jury that she was "misspeaking" when she made this statement during her deposition, but she also acknowledged that she has called herself a compulsive liar and that she lies as a defense mechanism to protect

26

herself.  Hamm's cited authorities indicate that a female sex offender's own statements about her intent to reoffend are a risk factor for recidivism.[9]

Applying the appropriate standard of review set forth above, we conclude that the experts' trial testimony, which was not conclusory, and the exhibits admitted into evidence allowed a rational jury to find beyond a reasonable doubt that Hamm has a behavioral abnormality that makes her likely to engage in a predatory act of sexual violence.  Accordingly, the evidence is legally sufficient to support the jury's finding that Hamm is an SVP within the meaning of the SVP Act.  We overrule Hamm's second and final issue.

## CONCLUSION

We affirm the trial court's final judgment and order of commitment.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Crump and Ellis

Affirmed

Filed:   February 6, 2026

---

[9]   Hamm's brief and her trial-court argument quote an article noting that a female sex offender's statement of intent to reoffend is an exception to the authors' recommendation that female sex offenders in California should generally be considered low risk because it is "prima facie compelling evidence to the contrary."